# Maul and Wife *versus* Rider.

1. Jacobs and Rider bought land jointly by articles; Rider obtained the articles, delivered them to the vendor June 1849, took new articles to himself, and had a deed made to himself January 1853, which was recorded September 1854. Ejectment was brought by Jacobs's heir July 1860. There was evidence of fraud in Rider from which a trust resulted. *Held*, that under the Act of April 22d 1856, § 6, recording the deed was no evidence that the party had notice of the fraud or might have discovered it by reasonable diligence.

2. The record of a deed is notice only to those who are bound to search for it. It is not publication to the world at large.

3. By reasonable diligence is meant, where there is some reason to awaken inquiry and direct diligence in a channel in which it would be successful.

4. Whatever puts a party on inquiry amounts to notice, provided the inquiry becomes a duty and would lead to the knowledge of the requisite fact by ordinary diligence and understanding.

5. General rumor of the fact is not sufficient to place a party on inquiry. There must be some act or declaration from an authentic source, which a person would be careless if he disregarded.

| | |
|---|---|
| 59 | 167 |
| 129 | 403 |
| 59 | 167 |
| 159 | 285 |
| ¹59 | 167 |
| 173 | 549 |
| 59 | 167 |
| 187 | 216 |
| 59 | 167 |
| 26 SC | ⁴173 |
| 59 | 167 |
| 214 | ²499 |
| 59 | 167 |
| 38SC | ²503 |

October 19th and 20th 1868. Before Thompson, C. J., Read, Agnew and Sharswood, JJ.

Error to the Court of Common Pleas of *Jefferson county*: Of October and November Term 1867, No. 128.

This was an action of ejectment, brought by Frederick Maul and Mary E. his wife (late Jacobs) in her right, against John Rider and Philip Deitrich, for 300 acres of land in Winslow township, Jefferson county. The writ was issued July 12th 1860.

At the trial a nonsuit was suffered as to Deitrich, who claimed 100 acres of the land in severalty.

This case was tried twice before, and the judgment at each trial reversed by the Supreme Court. It is reported in 10 Wright 376 and 1 P. F. Smith 377.

Both parties claim under George Latimer, deceased. On the trial the plaintiffs gave in evidence the following agreement:—

"Agreement, C. C. Gaskill, agent of Latimers, with Rider and Jacobs, dated 22d of March 1837, as follows, to wit:

"I agree to sell to John Rider and Martin Jacobs, lot No. 5, of tract No. 3853, and, if not sold, 100 acres off the west end of the lot south of said lot; making together 300 acres, for the sum of $600, payable as follows, viz.: $120 now in hand, and the residue thereof in four equal annual payments from this date; and to give a good title therefor on the payment of the purchase-money; if the lot south of No. 5 is sold, the said John and Martin are only to get lot No. 5, which they are to pay $400 as above mentioned."

Endorsed were receipts; of March 22d 1837 and March 21st 1838 for $120 each, paid by Rider and Jacobs; March 21st 1839 $60 by Rider; April 30th 1839 $60 by Jacobs; February 28th 1849 $20 by Rider. There was also endorsed the following:—

[Maul *v.* Rider.]

" Given up and resold to John Rider, 6–9, 1849; Jacobs's part having been sold some years ago for taxes, and repurchased from John Philliber by Rider."

Jacobs died in 1849, leaving a widow and one daughter, the plaintiff, who attained age the 6th of December 1855. She was married to the other plaintiff October 5th 1856. Shortly before Jacobs's death Rider came to his house and asked for the articles, saying he wanted to borrow money and give the land as security; Jacobs said if he wanted to borrow money he would give them to him, and the articles were delivered to Rider.

Gaskill testified that about 1849 Rider called on him several times to buy the whole 300 acres; Rider said Jacobs's part had been sold for taxes, the time for redemption had expired, and the land was lost to Jacobs; that he (Rider) had bought the land from John Philliber who held the treasurer's deed; that Jacobs was not present when the first contract was given up and the new one given to Rider alone.

On the 9th June 1849 Gaskill, for the Latimers, made the following agreement with Rider :—

" I agree to sell to John Rider, lot No. 5, and 100 acres of lot No. 6, of tract No. 3853, containing together 300 acres, and allowance of six per cent., for the sum of $317, payable as follows, viz. : $60 now in hand, and the residue thereof in three equal annual payments from this date, a good title to be given on the payment of the purchase-money." A receipt for $60 at the date of the agreement and one for $50, November 23d 1860, were endorsed on the agreement. Rider afterwards sold 100 acres to Deitrich for $225; the deed was made directly from the Latimers to Deitrich on the 20th of January 1853, and recorded February 16th 1859. The defendant gave evidence of a parol partition between himself and Jacobs, Rider taking the west side and Jacobs the east; also a deed from the Latimers to him for 200 acres, dated January 19th 1853 and recorded September 28th 1854. The plaintiffs and defendants submitted a number of points; those noticed in the opinion of the Supreme Court with their answers are as follows :—

Plaintiffs' points: 4. " If the jury believe the facts in this case given in evidence by the plaintiffs, there was a gross fraud perpetrated by defendant; and as there is no evidence that the plaintiffs had notice of it five years before this suit was brought, or might have discovered it with reasonable diligence, the Act of 1856 will not protect the defendant; and therefore the plaintiffs are entitled to recover."

" We answer this point, that if the jury find that Rider obtained possession of the article of March 22d 1837 between Latimers and Rider and Jacobs for the avowed purpose of raising money to pay off his portion of the land, and then took it to Gaskill and

[Maul v. Rider.]

by falsehood and misrepresentations procured a new article for the whole of the land to himself, and finally on payment of the purchase-money a deed for the whole, to the exclusion of Jacobs, it would be a fraud, and he would be trustee *ex maleficio* of the title of Jacobs or his heir. We see no evidence of notice to the plaintiff or her ancestor, and the Act of 1856 would not run till the discovery of the fraud, or when by reasonable diligence the plaintiff might have discovered it. We think the recording of his deed by Rider from Gaskill in 1854, showing the whole of the title being in defendant, would be such a publication of holding adversely to the plaintiff as to put her upon inquiry, and that by reasonable diligence she might have discovered it."

7. "There is no evidence in this case that Jacobs, in his lifetime, or Mrs. Maul, his heir, had notice of the surrender of the first contract or of the new one by Rider with the agent of Latimers, and that the plaintiff is, therefore, entitled to recover."

"We answer that there is no direct notice given to the plaintiff, but the recording of his deed in 1854 by the defendant, was such a publication of his title that the plaintiff might by reasonable diligence have discovered it, and thus have discovered the fraud; and the act having been passed in 1856, she would be one of the class provided for, and would be bound unless she brought her action in *two years*, or she may had five years from the time when defendant's deed was recorded; but we think she could not maintain her suit after that time; and your verdict ought to be for the defendant."

Defendant's point: 1. "The lands in controversy having been conveyed to the defendant by deed bearing date the 19th January 1853, which deed was recorded the 28th September 1854; such recording was notice to the plaintiffs, and having failed to bring her action within the time required by the 6th section of the Act of 22d of April 1856, she is not entitled to recover."

"We answer this point that it was such a fact as by reasonable diligence would have enabled her to discover the fraud, and therefore we answer in the affirmative."

The verdict was for the defendant. The plaintiffs sued out a writ of error and assigned for error—

3 and 5. The answers to their 4th and 7th points; and,

6. The answers to the defendant's 1st point.

*D. Barclay* (with whom were *Smullen, Jenks* and *Winslow*), for the plaintiffs in error, referred to the Act of April 22d 1856, § 6, Pamph. L. 532, Purd. 654, pl. 13; Pennock *v.* Freeman, 1 Watts 401; Maul *v.* Rider, 1 P. F. Smith 377, 385; Mullock *v.* Souder, 5 W. & S. 198; Martindale *v.* Warner, 3 Harris 471; Miller *v.* Franciscus, 4 Wright 335.

[Maul *v.* Rider.]

*W. P. Jenks* (with whom was *G. A. Jenks*), for defendant in error, referred to Act of 1856; Maul *v.* Rider, *supra;* Rider *v.* Maul, 10 Wright 376; Warfield *v.* Fox, 3 P. F. Smith 382.

The opinion of the court was delivered, January 5th 1869, by

SHARSWOOD, J.—This cause has been in this court by writ of error twice, and is reported in 10 Wright 376 and in 1 P. F. Smith 377. The principal points of contention were settled in those cases and we see no reason to review them. They dispose of all the errors now assigned except the 3d, 5th and 6th.

It was decided that there was evidence of a fraud in Rider, from which a trust *ex maleficio* resulted, of which the plaintiff Mrs. Maul could avail herself, unless she was barred by the limitation provided by the 6th section of the Act of April 22d 1856, Pamph. L. 532. That section limits to five years the time within which an action may be brought to enforce any implied or resulting trust as to realty, "provided that as to any one affected with a trust by reason of his fraud, the said limitation shall begin to run only from the discovery thereof, or when by reasonable diligence the party defrauded might have discovered the same." In Maul *v.* Rider, 1 P. F. Smith 377, the judgment below was reversed, because from one of the answers to the plaintiffs' points the jury might have understood that there was no such fraud as raised a trust, unless Rider undertook to act as agent for Jacobs. "The legal title to the land," said Mr. Justice Strong, "was not acquired from the Latimers until January 19th 1853. Of course there could have been no trust of that before that time. But Jacobs died in 1849. He never, therefore, had any knowledge of the fraudulent acquisition, or any means of knowledge. When he died, his daughter the plaintiff was a minor, and she did not attain her majority until December 5th 1855, within five years from the time when this action was brought. I find no evidence that she ever knew of the fraudulent acquisition of the title before she came of age, or before this suit was brought or evidence that reasonable diligence would have revealed the fraud to her. It is true, the court was not asked to charge that there was no such evidence, and here is the difficulty, had they been so asked they could not have refused." The only new fact bearing on this question, which appears on this record, and which did not appear before, is that the conveyance of the legal title,—the deed of January 19th 1853, E. & M. Latimer to John Rider, was recorded September 28th 1854. In answer to the plaintiff's 4th point, that there was no evidence that the plaintiff had notice or might have discovered the fraud with reasonable diligence, the court answered, "We think the recording of his deed by Rider in 1854, showing the whole of the title being in the defendant, would be such a publication of holding adverse to the plaintiff as

[Maul *v.* Rider.]

ought to have put her upon inquiry, and that by reasonable diligence she might have discovered." The same instruction is in substance repeated in the answers to the plaintiff's 7th and the defendant's 1st point. These answers are the subject of the 3d, 5th and 6th errors assigned.

It is sometimes said that the record of a deed is constructive notice to all the world. That, it is evident, is too broad and unqualified ,an enunciation of the doctrine. It is constructive notice only to those who are bound to search for it: thus subsequent purchasers and mortgagees, and perhaps all others who deal with or on the credit of the title, in the line of which the recorded deed belongs. But strangers to the title are in no way affected by it. Thus it has been held that the record of a deed between third persons is no notice to a purchaser at sheriff's sale who does not claim through or under that deed: Keller *v.* Nutz, 5 S. & R. 246.

If conveyances from one stranger to another would be notice to all the world, miserable would be the situation of the purchaser:" Duncan, J., Id. In like manner the recording of subsequent titles by grantees, unconnected by the record with the original title, will not affect a purchaser: Lightner *v.* Mooney, 10 Watts 407. Now, as to the transaction between the Latimers and Rider, the plaintiff was as much a stranger to it as if her title had been to other land. Her equity could not be affected by any deed of Latimer to Rider, for Rider would take with notice. She had a right to act on the presumption that Rider was honest.

There was no relation, no fact, no circumstance of suspicion which imposed on the plaintiff the duty of searching the recorder's office to find out whether Rider or anybody else, by obtaining a deed for the legal title, meant to claim adversely to her. The registry of the deed is not publication to the world at large—it is far from being so in fact, and it is not so in law. The words of the Act of Assembly are not "when the party defrauded might have discovered the same," but when "by reasonable diligence" he might have done so. These words are surely not to be rejected and the act construed as if they were not in it. There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence.

We are bound to apply to the interpretation of this statute that principle in regard to constructive notice which has been so long and well settled—that whatever puts a party on inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty, as in case of purchasers and creditors, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding: Jacques *v.* Weeks, 7

[Maul *v.* Rider.]

Watts 267.  Even a general rumor of a conveyance would not have been enough to have made it the duty of the plaintiff to search the record.   Notice of such a rumor is not considered as either actual or implied notice.   Indeed, to set on foot an inquiry into the foundation of mere rumors would, in most cases, be a vain and impracticable pursuit : Ibid.   There must be some act— some declaration from an authentic source—which a person would be careless if he disregarded, which is necessary to put a party on inquiry, and call for the exercise of reasonable diligence.   We see no evidence in this case of anything to put the plaintiff on inquiry.   The same state of things which would have put her on inquiry of the record would have sufficed to have driven her to seek for information from the grantors, or even from Rider himself.   The record was only one source of knowledge, but not necessarily the only one.   We are of opinion that there was error in the instruction of the court of which the plaintiffs in error complain.

If the jury in the court below were of the opinion that there was an executed parol partition of the land between Jacobs and Rider, then the defendant was entitled to a verdict in his favor for his part in severalty.   So if the jury were of the opinion that the deed from Latimer to Rider, dated January 19th 1853, was procured by the fraud of Rider, then as there was no evidence in the case that Mrs. Maul had notice, or might by reasonable diligence have discovered the same within the period of limitation prescribed by the Act of 1856, before suit brought, the plaintiffs were entitled to a verdict for the remaining moiety of the tract, the share of Jacobs in severalty, and the jury should have been so instructed.

Judgment reversed, and *venire facias de novo* awarded.